## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ESCAMBIA COUNTY BOARD OF EDUCATION,** )<br>)<br>) | |
| **Appellant,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 05-0009-WS-B** |
| ) | |
| **JARRED BENTON,** ) | |
| ) | |
| **Appellee.** ) | |

## ORDER

This matter is before the Court on appellant Escambia County Board of Education's Motion for Summary Judgment or, in the alternative, Judgment on the Administrative Record (doc. 29). Also pending is appellant's Motion to Supplement (doc. 33) its filings by reference to the recent Supreme Court decision in *Schaffer ex rel. Schaffer v. Weast*, --- U.S. ----, 126 S.Ct. 528 (Nov. 14, 2005). The Motions have been briefed and the appellant has also submitted the administrative record, which consists of more than 1,200 pages of transcripts and exhibits.[1]

---

[1]     At the inception of the briefing process, the Board filed a Motion to Permit Enlargement of Brief (doc. 27), requesting leave to file a principal brief of up to 50 pages because of the judicial review nature of these proceedings and the existence of a developed record. In an Order (doc. 28) dated September 22, 2005, the Court questioned the validity of these reasons for exceeding the ample, well-established page limits but granted the motion, subject to several specific caveats. The undersigned was pleasantly surprised when the Board's counsel filed a 27-page Memorandum (doc. 30); however, such sentiments evaporated upon review of appellant's 32-page Suggested Determination of Facts and Conclusions of Law (doc. 30). Despite its innocuous title, this document in actuality is a separate brief containing little overlap with its colleague. For example, the Board devotes 20 pages of the latter filing to facts that are nowhere presented in the former document, and repeatedly cross-references sections of one document from within the other, thereby stripping out critical detail, argument, analysis and case citations from its Memorandum, presumably to foster an illusion that the Memorandum satisfies the Local Rules and the undersigned's instructions. Such a briefing strategy is inappropriate for two reasons. First, it represents a transparent attempt to circumvent the strictures of LR 7.1(b) and the principles outlined in September 22 Order. Second, it is inefficient and unwieldy because it obligates the Court to read two interwoven documents in tandem in order to glean the gist of the Board's arguments. Far too often, the Board's brief

I.      **Background.**

    *A.      Procedural Posture.*

        This action arises pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA").  The stated purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A); *see also Cory D. ex rel. Diane D. v. Burke County School Dist.*, 285 F.3d 1294, 1298 (11th Cir. 2002); *Walker County School Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1294 (11th Cir. 2000).  To that end, the IDEA requires schools to assemble a team (including educators and the child's parents) to evaluate each child with a disability and to develop and implement an individualized education program ("IEP") specifying educational and developmental goals for that student.  *See Ortega v. Bibb County School Dist.*, 397 F.3d 1321, 1324 (11th Cir. 2005).  The IEP must be reviewed periodically, but no less frequently than annually, by the IEP team to determine whether the student is achieving goals and whether modification is necessary.  *See id.* at 1325.

        Appellee Jarred Benton ("Benton") is a twelve-year old student who, at all relevant times to these proceedings, attended W.S. Neal Elementary School, a facility within the school system administered by the appellant, Escambia County Board of Education (the "Board").  The singular issue animating this dispute is whether the Board has provided Benton, who has been diagnosed with autism spectrum disorder,[2] with a free, appropriate public education ("FAPE") conforming

      string-cites multiple paragraphs from the Suggested Determinations with no amplification or explanation, leaving to the Court the responsibility of connecting the dots and speculating as to how those paragraphs relate to the Board's contentions.  Had the undersigned been aware of these defects earlier in the briefing process, it would have struck both filings and required the Board to resubmit a single unified brief that rectifies these flaws.  As it stands, however, the Court in its discretion will accept the Board's filings, rather than delaying resolution of these proceedings by requiring rebriefing.

      [2]      Hearing testimony reflected that autism spectrum disorder is a developmental disability significantly affecting verbal and nonverbal communication and social interaction, and is characterized by such behaviors as repetitive activities, stereotyped movements, resistence to changes in environment or routines, and unusual responses to sensory experiences.  (Hrg. Transcript, at 630-31.)  *See County School Bd. of Henrico County, Virginia v. Z.P. ex rel. R.P.*,

to its obligations under the IDEA.

On March 11, 2004, Benton (by and through his mother, Lisa White) initiated administrative proceedings by requesting an impartial due process hearing from the Alabama Department of Education.  Benton asserted that the Board had failed appropriately to evaluate and identify him as a student with a disability, had failed to prepare an appropriate IEP, and had failed to provide appropriately trained personnel to formulate and implement behavior management strategies for him.  In response to directives from the Hearing Officer to elaborate on his claims, Benton delineated three dissatisfactions with the existing IEP, including: (a) failure to address the escalating inappropriate, self-injurious and aggressive behaviors exhibited by Benton in recent months; (b) failure to state strategies in a manner consistent with Benton's needs or with applicable state and federal law; and (c) failure to address Benton's need for an appropriate behavior intervention plan.  The Board countered by a request for due process hearing of its own, maintaining that Benton's parents and counsel were obstructing its attempts to implement educational services for Benton.  All of these issues were joined in a single due process hearing, conducted over the course of three days in the summer and fall of 2004 before Hearing Officer Wesley Romine.

**B.      *The Administrative Decision.***

On or about November 8, 2004, the Hearing Officer issued a 29-page Due Process Decision (the "Administrative Decision") largely (although not entirely) adverse to the Board. In that decision, the Hearing Officer noted that Benton has been receiving special education services from the Board since 1997 and that Ms. White has participated in 11 IEPs for her son with Board officials.  However, none of the IEPs had a behavior management component, notwithstanding Benton's mother's requests for same.  She participated in the 2003-04 IEP for Benton despite its omission of behavior plan provisions.  Because of the pendency of the due process hearing, Ms. White declined to attend a scheduled meeting with the IEP Team to formulate an IEP for Benton for the 2004-05 school year.

---

399 F.3d 298, 300 (4th Cir. 2005) ("Autism is a developmental disorder that affects a child's ability to communicate, use imagination, and establish relationships with others. ...Children with autism generally have significant deficits in language development, behavior, and social interaction.").

The Administrative Decision devoted substantial attention to the conduct of Benton during the hearing itself.  In particular, Benton's behaviors included "flapping his arms, repeatedly striking his chest and stomach with an open hand, making unintelligible noises, clapping and pacing around the room." (Administrative Decision, at 9.)  He had numerous inappropriate interactions with others in the hearing room, including pulling his lawyer's hair, kissing his expert on the cheek twice, touching/rubbing the Hearing Officer's head, and grabbing the shoulders of another lawyer.  (*Id.*)  Upon his removal from from the hearing room, Benton struck himself and subsequently burst back into the room.  (*Id.* at 9-10.)

The Board offered extensive testimony from Dr. Robert Simpson, an expert on autism, that Benton did not require a functional behavior analysis or behavior intervention plan because his behaviors were characteristic of autism, that he had observed no aggressive behavior from Benton during a three-hour observation session, that any inappropriate behaviors by Benton were successfully managed by school personnel, and that the school system appeared to be managing Benton appropriately via one-on-one instruction in a predictable, structured environment.  (*Id.* at 9-11, 13.)  The expert attributed Benton's disruptive conduct at the hearing to the effects of being in a strange room with strange people, outside of a structured classroom environment, and opined that Benton had displayed no signs of aggression.  (*Id.* at 12.)  However, Dr. Simpson also acknowledged problems with the IEPs for Benton, such as absence of dates of mastery of benchmarks, lack of any record of Benton's progress and achievement, omission of measurable annual goals, and failure to describe special education services with specificity.  (*Id.* at 13-14.)[3] The expert testified that the IEPs did represent a good faith effort on the part of the Board to provide educational services to Benton, and that whatever mistakes may have been made did not cause Benton's education to suffer.  (*Id.* at 14.)  In light of his opinion that Benton was making progress, the expert asserted that Ms. White's refusal to allow an IEP for 2004-05 impeded the Board from taking appropriate and required actions to supply special education services to

---

[3]      During the hearing, the Board for the first time proffered different copies of those IEPs for 2002-03 and 2003-04 that included dates of mastery of various designated benchmarks. The Hearing Officer excluded those documents from evidence because the Board had not timely furnished them to Benton's counsel, in accordance with the requirements of 20 U.S.C. § 1415(f)(2)(A)-(B).  (*Id.* at 15-16 & n.2.)  That evidentiary ruling is not appealed here.

Benton.  (*Id.* at 15.)

The Board's special education coordinator, Suzanne Barnett, testified at the hearing that Benton had achieved success on many benchmarks in his IEPs, that those IEPs designated appropriate strategies for Benton's education, that Benton did not require a behavioral aide, and that he was making adequate progress toward annual goals.

Upon consideration of this and other evidence, the Hearing Officer concluded that Benton's IEPs for 2002-03 and for 2003-04 were "improperly written and therefore violated [Benton]'s right to a free appropriate public education."  (Administrative Decision, at 28.)  He further found that Benton's right to a FAPE was compromised by the Board's failure "to conduct a functional behavior assessment and to draft and implement either an appropriate behavior intervention plan or to revise [Benton]'s IEPs to address [his] autistic behavior."  (*Id.*)  In support of these determinations, the Hearing Officer reasoned that behavior assessments and modification plans are important where a child demonstrates inappropriate or disruptive behavior.  Although acknowledging that the Board's witnesses consistently expressed a view that no behavior modification plan was necessary, the Hearing Officer reasoned that:

> "the more compelling evidence was the behavior that the Petitioner demonstrated when he appeared at the due process hearing.  Although the school system's expert did not view that behavior as 'aggressive,' the Hearing Officer disagrees. Pulling hair, fondling heads, kissing and touching persons who are strangers ... constitute 'aggressive' behavior in the view of the Hearing Officer. ... It is disruptive behavior.  It must be viewed as impeding the education (or activities) of other persons.  Similarly, Petitioner repeatedly struck himself.  Such self-injurious behavior also indicated a need for behavior interventions.  The fact that the behaviors demonstrated by the child are a manifestation of Petitioner's autism does not excuse a school system from providing behavior management techniques either in the child's IEP or in a separately formulated behavior intervention plan. ... Yet no significant efforts have been made in that direction by the school system.  That omission violated Petitioner's right to a free appropriate public education."

(Administrative Decision, at 20-21.)

In addition to finding that the Board's failure to implement behavioral assessment and intervention plans violated Benton's right to a FAPE, the Hearing Officer identified several other defects in the IEPs for 2002-03 and for 2003-04 that, in his view, rendered them legally inadequate.  Specifically, the Hearing Officer sharply criticized the absence of notations as to

-5-

whether Benton had mastered benchmarks (thereby rendering it impossible for Benton's parents and IEP team members to track his progress during the school year) and the vague representations in the IEPs regarding Benton's present level of performance (a standard against which Benton's annual goals were to be weighed and measured). (Administrative Decision, at 23.) Given the paucity of meaningful benchmark records or clear, measurable goals, the Hearing Officer declared that the defective IEPs violated Benton's right to a FAPE.

In short, then, the Hearing Officer concluded that, despite the school system's good faith effort to provide special education services to him, the Board had violated Benton's right to a FAPE under the IDEA by: (i) writing improper IEPs for the 2002-03 and 2003-04 school years, including vague, unmeasurable goals and untracked benchmarks; and (ii) failing to conduct a functional behavior assessment and either to implement an appropriate behavior intervention plan or to revise Benton's IEPs to address his autistic behavior. (*Id.*)[4] The instant appeal followed,[5] with the Board delineating the following five assignments of error: (a) Benton failed to give required notice of the facts of the alleged violations, and the Hearing Officer found violations based on facts not alleged as violations by relying on events outside the record; (b) the Hearing Officer improperly assigned the burden of proof to the Board; (c) the evidence did not support a finding that the Board's failure to implement a behavioral intervention plan for Benton violated the IDEA; (d) the evidence showed that the Board had in fact maintained proper records

---

[4]     Although these are the salient determinations for purposes of the instant appeal, the Hearing Officer also made the following findings: (a) that Benton's claim of inadequate training was meritless because the special education teacher assigned to Benton had specific training in instruction of autistic children, such that "[a] school system can do little more than what was done in this case to provide training for its teachers" (*Id.* at 24.); and (b) the Board was not deprived of its due process rights when Benton's mother invoked the "stay-put" provisions of IDEA to maintain Benton's current educational placement pending the due process hearing. (*Id.* at 25.) No request for judicial review having been made to either of these determinations, the undersigned will not revisit them.

[5]     In briefing the Board's dispositive Motion, Benton maintains that this action fails to state a claim upon which relief can be granted because the Board failed to file an appropriate initial pleading. (Benton Brief, at 22-23.) Because the undersigned has construed the Notice of Appeal as a complaint for purposes of this action, and because Benton did not interpose this objection until some eight months after this action commenced, the Board's appeal will not be dismissed on that basis.

and progress reports pertaining to Benton's annual goals, and his mastery of same; and (e) any technical violations in Benton's IEP are insufficient as a matter of law to deprive him of a FAPE. (Motion for Summary Judgment, at 1-3.)

## II.      Standard of Review.[6]

To effectuate the IDEA's stated purpose of ensuring that children with disabilities are afforded a FAPE that emphasizes special education and related services designed to meet their unique needs, the statute requires public school systems to evaluate and identify children with disabilities, and to develop an IEP for each such child.  *See Walker*, 203 F.3d at 1294.  If the child's parents are dissatisfied with the IEP, then they have the right to an impartial due process hearing.  *See id.*  This is precisely what transpired here, as Benton's mother requested and received a due process hearing regarding her objections to Benton's IEP late in the 2003-04 school year.

Under the IDEA, any party aggrieved by an administrative decision "shall have the right to bring a civil action ... in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A); *see also Ortega*, 397 F.3d at 1325 ("A party not satisfied with the decision of the hearing officer may bring a civil suit in federal district court.").  The Board, which is aggrieved by the Hearing Officer's determinations that it failed to provide Benton with a FAPE in several respects, did just that.  In such proceedings, this Court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on

---

[6]      The Board casts its Motion as a Motion for Summary Judgment or, in the Alternative, a Motion for Judgment on the Administrative Record.  Such ambiguity is understandable given the uncertainty as to the appropriate procedural mechanism for presenting IDEA judicial review cases to a court for final disposition.  *See Loren ex rel. Fisher v. Atlanta Independent School System*, 349 F.3d 1309, 1313 (11th Cir. 2003) (pointing out that ordinary Rule 56 principles have no application in IDEA cases, that summary judgment may be appropriate in IDEA cases even with disputed facts based on a preponderance of the evidence, and that district court decision is perhaps better characterized as judgment on the record); *Walker*, 203 F.3d at 1297 (questioning proper mechanism, but declining to decide issue because it was not squarely presented on appeal).  The Court proceeds in recognition of these authorities. In the event that summary judgment or judgment on the administrative record is not appropriate, the Court will conduct a bench trial to resolve disputed issues of fact that cannot be addressed via pre-trial dispositive motions.  *See Loren*, 349 F.3d at 1313, 1318.

the preponderance of the evidence, shall grant such relief as the court determines is appropriate."
20 U.S.C. § 1415(i)(2)(B).  The judicial review provision in the IDEA has been maligned as
"puzzling" and "somewhat confusing" because it deviates from the familiar "substantial
evidence" standard for review of administrative decisions.  *Walker*, 203 F.3d at 1297.  In the
IDEA context, an administrative decision "is entitled to due weight and the court must be careful
not to substitute its judgment" for that of the hearing officer.  *Id.*  That said, the decidedly
malleable and amorphous threshold is that "the extent of the deference to be given to the
administrative decision is left to the sound discretion of the district court which must consider
the administrative findings but is free to accept or reject them."  *Id.* at 1297-98; *see also Doe v.
Alabama State Dep't of Educ.*, 915 F.2d 651, 657 n.3 (11th Cir. 1990) (same).[7]  Reviewing courts
are admonished to avoid imposing their view of preferable educational methods in particular
cases, especially given courts' lack of the specialized knowledge and experience required to
resolve complex questions of educational policy.  *See JSK By and Through JK v. Hendry County
School Bd.*, 941 F.2d 1563, 1573 (11th Cir. 1991); *Hartmann by Hartmann v. Loudoun County
Bd. of Educ.*, 118 F.3d 996, 1002 (4th Cir. 1997) (opining that "state proceedings must command
considerable deference in federal courts" in IDEA context).[8]

---

[7]       One strand of authority suggests that the degree of deference a district court
should extend to IDEA administrative determinations turns on whether a particular decision
implicates the agency's educational expertise.  *See Loren*, 349 F.3d at 1314 n.5 ("Courts owe
some judicial deference to local administrative agency judgments [in IDEA cases], though that's
typically limited to matters calling upon educational expertise."); *McLaughlin v. Holt Public
Schools Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (noting that administrative
determinations are due greater weight "on matters for which educational expertise is relevant").
Courts have also indicated that a greater measure of deference is warranted when a hearing
officer's findings appear "thorough and careful," as is unquestionably the case here, or where the
administrative findings turn on credibility determinations.  *Union School Dist. v. Smith*, 15 F.3d
1519, 1524 (9th Cir. 1994); *see generally R.D. ex rel. Kareem v. District of Columbia*, 374 F.
Supp.2d 84, 89-90 (D.D.C. 2005) ("Where the Hearing Officer's findings are based on credibility
determinations of live witness testimony, as they were here, and there is no supplementation of
the record before the Court, particular deference is due to the Hearing Officer's decision.").

[8]       To augment the schizophrenic quality of the caselaw articulating the appropriate
standard of review, the Eleventh Circuit has stressed that "the district court conducts an
*entirely* de novo review of the ALJ's findings" in IDEA cases.  *K.C.*, 285 F.3d at 983.  Such a
pronouncement may not be irreconcilable with principles of deference to educational expertise,

## III.    Analysis of Issues Presented.

As mentioned *supra*, the Board contends that the Administrative Decision must be overturned for five distinct reasons, to-wit: (a) Benton furnished the Board with insufficient notice of the alleged violations, and the Hearing Officer found violations based on events outside the record; (b) the Hearing Officer improperly placed the burden of proof on the Board; (c) the evidence did not support the finding that the Board's failure to implement a behavioral intervention plan for Benton violated the IDEA; (d) the evidence showed that the Board had in fact kept proper records and reports pertaining to Benton's goals, and his mastery of same; and (e) any technical violations in Benton's IEPs are legally insufficient to deprive him of a FAPE. (Motion for Summary Judgment, at 1-3.)[9]  To ensure a comprehensive judicial determination for appellate purposes and to minimize inefficiencies on appeal, the Court will address each of these legal issues.[10]

-------------------------------------------

granting "due weight" to the administrative decision, and non-substitution of judgment for that of the hearing officer, but it certainly does underscore the tension and ambiguities permeating the appellate guidance on this point.

[9]    The Board's Statement of Issues on Appeal (doc. 24) identified as one of its five issues whether the Board's due process rights were denied when Benton's parents refused to attend IEP meetings and when the Hearing Officer ordered the Board to refrain from implementing a new IEP for Benton for the 2004-05 school year.  This ground for appeal was not mentioned in the Board's summary judgment filings; therefore, it has been waived. *See Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (noting that a claim may be considered abandoned when it is included in complaint, but plaintiff fails to argue it to district court).  This determination is grounded on the well-worn principle that "the onus is upon the parties to formulate arguments."  *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997).

[10]    The Eleventh Circuit has frowned upon district court attempts to take shortcuts by resolving IDEA claims based on a singular issue, while failing to address the remaining issues presented for judicial review.  *See Loren*, 349 F.3d at 1319 (explaining that while it understood and did not criticize district court for trying to dispose of IDEA case on single narrow ground, on remand district court must enter findings of fact and conclusions of law on each issue in the case

### A.    *Adequacy of Notice and Extra-Record Evidence.*

As its first assignment of error, the Board contends that Benton failed to give notice before the due process hearing of the manner in which he contended the IEPs were faulty, and that the Hearing Officer compounded the deficiency by finding IDEA violations that Benton had never alleged as violations and relying on events outside the record.[11]  In his initial request for due process hearing dated March 11, 2004, Benton alleged that the school system had violated the IDEA by failing to "provide an [IEP] that complies with the [IDEA] and the laws and regulations promulgated thereto."  (Hrg. Officer Exh. 1.) On May 27, 2004, the Hearing Officer directed Benton's counsel to apprise the Board "about what is inadequate about the present educational plan for the child."  (Hrg. Officer Exh. 4.)  Benton's counsel complied via letter dated June 4, 2004, in which he contended the IEP was inadequate because it (a) failed to address Benton's escalating inappropriate behaviors, (b) "does not state strategies in a manner consistent with Petitioner's nature and needs, and further, the strategies that are included in the [IEP] are inconsistent with" the law in unspecified ways, and (c) failed to address an appropriate behavior intervention plan.  (Hrg. Officer Exh. 7.)  Therefore, as of early June 2004, the Board was unequivocally on notice that Benton intended to litigate the behavioral aspect of the IEPs, as well as defects in certain IEP "strategies."  There is no indication that the Board sought further

---

and make alternative rulings, "[g]iven the complexity of the issues and in an effort to avoid piecemeal appeals").  The Court takes this directive to heart here, despite the somewhat laborious nature of the process of parsing through each of the Board's five grounds for review.

[11]    The Board postures this alleged error as a denial of due process rights.  It is unclear whether the Board invokes "due process" as a constitutional defect or simply a statutory one. However, the Board offers no authority and no meaningful analysis showing that the alleged deprivation is one of constitutional magnitude.  At most, defendant cites the unpublished decision in *Beckwith v. Bellsouth Telecommunications Inc.*, 2005 WL 2012667 (11th Cir. Aug. 22, 2005), in support of the proposition that "[d]ue process ... requires that claims against a defendant be specified with clarity and precision."  (Suggested Determinations, at 22.)  This argument is incorrect.  First, *Beckwith* had nothing to do with due process, but rather involved straightforward application of the Federal Rules of Civil Procedure.  Moreover, *Beckwith* can have no relevance to the Benton due process hearing because those proceedings were not governed by the Federal Rules of Civil Procedure.  Aside from its unpersuasive reliance on *Beckwith*, the Board's arguments hinge on the statutory notice provisions of the IDEA; therefore, the Court's discussion of the issue will follow suit.

clarification, through either formal or informal means, of the sufficiency of Benton's June 4 explanation of its IEP-related dissatisfactions prior to the hearing, particularly as to the "strategies" challenged by Benton's counsel.

At the due process hearing, Benton put on evidence, and the Hearing Officer concluded, that the IEPs violated the IDEA because they lacked notations showing dates of mastery of stated benchmarks (such that Benton's parents and teachers could not monitor his progress) and because the IEPs suffered from vagueness and measurability problems as to Benton's annual goals.[12]  The Board protests that it was not given notice that these alleged violations would be at issue in the due process hearing, such that the hearing effectively metamorphosed into a trial by ambush.  The Board's position is that because the lack of behavioral assessments/plans was the only IEP defect specifically enumerated by Benton prior to the hearing, Benton should have been barred from objecting to (and the Hearing Officer should have been barred from finding IDEA violations as to) any other aspect of the IEP.  (Suggested Determinations, at 14-16; Board Memorandum, at 7-8, 11.)[13]

---

[12]     The Board hypothesizes (without support) that the Hearing Officer's findings against it on these points were motivated by animus arising from the Board's conceded failure to furnish complete copies of Benton's educational records to Benton's lawyer for inspection and copying prior to the hearing, as well as the Hearing Officer's belief that the Board had tampered with and altered those records after the fact.  (Board Memorandum, at 9-14.)  The Board also devotes nearly six pages of its principal Memorandum to explaining its failure to provide the records to Benton's counsel.  This document production issue has tangential relevance, if that, to the legal questions presented for judicial review.  The Board has not disputed the Hearing Officer's finding that the omitted records were inadmissible; therefore, it is unclear why the Board offers a lengthy narrative attempting to exonerate and excuse its failure to produce the requisite documents in a timely manner.

[13]     The Board's filings also make much of Benton's failure to identify which IEPs were objected to prior to the hearing (Reply Brief, at 1-2) and his contention at the hearing that every IEP for six years was defective (Memorandum, at 7).  However, the Board undercuts its own objection on this score by referencing the Hearing Officer's ruling that no challenges to Benton's IEPs predating March 2002 would be allowed, thereby vastly narrowing the potential universe of claims presented.  (Suggested Determinations, at 11-12.)  It is inconceivable that the Board would suffer prejudice from Benton's complaints about six years' worth of IEPs, when the Hearing Officer permitted him to raise arguments only with respect to the most recent two IEPs.  Besides, any concerns the Board may have had to the temporal reach of the due process hearing could have been addressed in advance of the hearing.  There is no indication that the Board

Language in the statute lends superficial support to the Board's position.  In particular, the IDEA requires parents invoking the due process hearing mechanism to provide notice to the educational agency including, without limitation, "a description of the nature of the problem of the child relating to such proposed initiation or change, ***including facts relating to such problem***."  20 U.S.C. § 1415(b)(7)(B)(ii) (emphasis added).  But the statute does not specify that <u>all</u> facts relating to the parents' dissatisfaction must be spelled out in the notice, much less that every legal theory must be set forth in painstaking detail at that time to avoid waiver.  Such a burdensome, unwieldy standard would far exceed that to which federal court plaintiffs are held, and seems antithetical to the more nimble, less rule-intensive character of administrative proceedings.  The Board has come forward with no court authorities reading this section so expansively, and the Court's own research has disclosed none.[14]  To the contrary, in the only published federal decision citing § 1415(b)(7)(B)(ii) the Supreme Court recently observed that Congress has legislated IDEA due process hearing procedures by "impos[ing] minimal pleading standards."  *Schaffer ex rel. Schaffer v. Weast*, --- U.S. ----, 126 S.Ct. 528, 532 (2005); *see also Sammons v Polk County School Bd.*, 2005 WL 2850076, *4 (M.D. Fla. Oct. 28, 2005) (finding that § 1415(b)(7)(B) does not require claimant to identify a specific IEP relating to the alleged problem).  Such a "minimal pleading standards" construction of the relevant statutory language is irreconcilable with the Board's demand for exacting, all-inclusive cataloguing of all legal

_____

sought to do so.

[14]      To be sure, the Board cites *Combs v. School Bd. of Rockingham County*, 15 F.3d 357, 363-64 (4th Cir. 1994) on this point.  In *Combs*, the court affirmed the denial of a student's request for attorney's fees where the student's mother requested a due process hearing without identifying her concerns to school officials in advance.  The Fourth Circuit stated that "Combs is free to resort to administrative and judicial action" in these circumstances, but that he cannot recover fees "when his efforts contributed nothing to the final resolution of a problem that could have been achieved without resort to administrative or legal process."  *Id.* at 364.  Hence, far from finding that the student gave legally insufficient notice to be entitled to present its claims at the due process hearing, the Fourth Circuit panel appeared perfectly comfortable with authorizing the student to proceed in such fashion.  The only limit the *Combs* court imposed was that a student could not obtain attorney's fees if he did not provide specific advance notice to the school system before activating the administrative process.  Thus, *Combs* cannot reasonably be read as supporting the draconian, exhaustive interpretation of § 1415(b)(7)(B)(ii) that the Board urges this Court to adopt.

theories and facts that Benton intended to invoke at the administrative hearing.  The Court cannot concur with the Board that the IDEA obligated Benton to plead with specificity every legal theory and fact underlying his claims in advance of the hearing.  Thus, the Court readily finds that the notice furnished by Benton neither subverted the procedural requirements of the IDEA, nor otherwise impaired the Board's due process rights.

Leaving aside the legal infirmity in the Board's position, this assignment of error suffers from a logical defect, as well.  There is no doubt that the Board knew Benton intended to litigate the sufficiency of the IEPs at the administrative hearing.  Moreover, the Board was squarely on notice as of the June 4 clarification that Benton believed the IEPs were inadequate because of their lack of a behavioral component, and because they did "not state strategies in a manner consistent with Petitioner's nature and needs."  The Board may have <u>assumed</u> that these unspecified "strategies" problems were connected to the behavioral issues, but apparently never sought to verify that assumption.  Indeed, it appears that the Board never followed up with the Hearing Officer or Benton's counsel prior to the hearing to seek elucidation of Benton's dissatisfactions.[15]  A reasonably prudent litigant in the Board's position would have known from the "strategies" statement that all aspects of the IEPs were subject to attack, and would have taken care to compare those IEPs to the discrete statutory requirements outlined in § 1414(d)(1)(A) in advance of the hearing.[16]  Such an approach would have enabled the Board to

---

[15]    The Board complains that the omission of more detailed notice is particularly egregious in this case because of the paucity of discovery tools at the administrative level.  Be that as it may, the Board's attorneys certainly could have contacted Benton's lawyers informally to request additional information as to Benton's specific concerns with the IEPs in advance of the hearing.  Alternatively, the Board could have petitioned the Hearing Officer to require such further clarification.  It does not appear that the Board took either step to educate itself as to Benton's IEP-related objections.

[16]    Contrary to the Board's asserted position here, it was not left to guess as to the nature of the alleged violations.  The IDEA lists seven required components of IEPs (an eighth did not apply to Benton because of his age), including (i) a statement of the child's present levels of educational performance; (ii) a statement of measurable annual goals, including benchmarks or short-term objectives; (iii) a statement of special education services to be provided; (iv) an explanation of the extent to which the child will not participate with nondisabled children in class activities; (v) a statement of any necessary modifications in state or districtwide student achievement assessment; (vi) the expected dates, frequency, location, and duration of special

anticipate and defend against any attacks Benton might mount to the validity of the IEPs. Simply put, the Board's "due process" objection to the notice received is unpersuasive because the Board knew that Benton felt that the IEPs were deficient, there is a finite set of statutory requirements for such IEPs, and the Board could have lined up Benton's most recent IEPs with each of the § 1414 requirements to see where problems might arise. That the Board may have elected not to do so cannot constitute a due process violation warranting reversal of the Administrative Decision.[17]

Finally, even if the Board's position that Benton should have provided further detail held legal and logical allure, there is no suggestion that the Board incurred prejudice as a result of this bit of secrecy. To the contrary, the Board concedes that when opposing counsel raised specific questions about the sufficiency of the IEP during the hearing, the Board countered "by having its witnesses testify additionally on issues raised by opposing counsel's questions." (Board Memorandum, at 8.) The Board does not assert that it would have presented additional witnesses or other evidence had it known of the specific aspects of the IEPs with which Benton found fault. To the contrary, it appears that the Board had exactly the witnesses and documents it required at the hearing to marshal rebuttal evidence and arguments against any aspect of the IEPs that Benton might call into question.[18] It also appears that the Board in fact marshaled and

_____

education services to be provided; and (vii) a statement of how the child's progress toward annual goals will be measured and how parents will be informed of their child's progress. By comparing this statutory checklist to the IEPs, the Board could easily have predicted and parried Benton's arguments and evidence that elements (i), (ii) and (vii) were not satisfied here.

[17] As the Hearing Officer put it when the Board's counsel objected during the hearing that benchmark mastery issues were not properly part of the case, "it is absurd to me that you all are coming in here and acting like you all did not know that that was an issue at this Due Process." (Hrg. Transcript, at 315.) Further, the Hearing Officer pointed out, Benton's notice "says, failing to draft an appropriate Individual Education Plan. That puts the whole IEP at issue." (*Id.* at 317.)

[18] When the Board's counsel objected on notice grounds during the hearing, the Hearing Officer rejected this argument pursuant to the same reasoning. Indeed, the Hearing Officer correctly noted, "You have Suzanne Barnett, your expert. You have your special ed teacher, who I can consider an expert. You've got your expert that you employed. You all can sit down and look at those IEPs and tell whether they are defective or not. Now, that's not surprise. ... All [Benton] has to do is say, this is an inappropriately written IEP. And that's what

presented this very rebuttal evidence, so there was no conceivable prejudice to the Board. Under the circumstances, it strains the concept of due process past the breaking point to suggest that the Board is entitled to reversal of the Administrative Decision because it did not receive a detailed breakdown of alleged legal infirmities in the IEPs in advance of the hearing.

As a last-ditch effort to buttress its position on the notice issue, the Board complains that the consequences of the Administrative Decision, if allowed to stand, will be nothing short of disastrous because it will expose school systems to endless permutations of IEP attacks that they cannot adequately foresee and defend against without drastic increases in cost and duration of due process hearings. (Reply Brief, at 14.) Such a "parade of horribles" is not realistically a concern on the facts presented here. Notwithstanding the existence of 11 IEPs for Benton, the Hearing Officer applied a two-year statute of limitations to Benton's objections, thereby confining the ambit of the hearing to the 2002-03 and 2003-04 IEPs. The Board cannot credibly assert that, confronted with an allegation that the IEPs were defective, it was unduly burdensome for the Board to compare the contents of those two IEPs with the finite, specific statutory requirements for same in preparation for the hearing. This is particularly true given the Board's ready access to a phalanx of IDEA specialists, including Dr. Simpson, special education coordinators and teachers, and the Board's retained counsel. Moreover, the Board failed to avail itself of available mechanisms to seek further clarification of the nature of Benton's objections to the IEPs in advance of the hearing, but instead made an unwarranted assumption that his dissatisfactions were confined to behavioral issues. To a large extent, the Board is the author of its own misfortune. In any event, the Court cannot and does not find that the notice provided by Benton compromised the Board's due process rights or otherwise jeopardized the integrity of the administrative process, so as to warrant reversal of the Administrative Decision.

For the foregoing reasons, the Board's notice objection to the Administrative Decision is **overruled.**[19]

---

he did." (Hrg. Transcript, at 529-30.)

[19]    In a single paragraph in its Memorandum, the Board also protests that certain of the Hearing Officer's findings regarding Benton's conduct in the hearing room (specifically, his alleged pulling of counsel's hair, his alleged grabbing of counsel's shoulders, and his struggling

### B.     Burden of Proof.

Next, the Board balks that the Hearing Officer allegedly applied an improper burden of proof at the administrative hearing. According to the Board, the Hearing Officer did not require Benton to present any evidence on the behavioral issue, but instead obligated the Board to bear the burden of establishing the correctness of its exclusion of a behavioral plan from the subject IEPs. (Board Memorandum, at 22-24.)

The Eleventh Circuit and, more recently, the Supreme Court have ascribed to a default rule that when a parent challenges the propriety of an IEP, the parent bears the burden of proving its inadequacy. *See Schaffer*, 126 S.Ct. at 537 ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.");[20] *Devine v. Indian*

_____

with female relatives upon being removed from the room) were not recorded in the official transcript. (Memorandum, at 20.) The Board argues that the evidence of these behaviors is "expressly unsupported" by witness testimony (Suggested Determinations, at 9), and urges the Court to reverse based on the Hearing Officer's citation to non-record evidence. This argument fails for four reasons. First, the testimony in question does not negate that such behaviors occurred, as the witness merely testified, "I don't remember that happening, to tell you the truth." (Hearing Transcript, at 410.) That same witness elaborated that "I didn't really notice whether he did [those things] or not, because I was paying attention to the hearing." (*Id.* at 424.) Certainly, nothing in the cited testimony contradicts the Hearing Officer's findings. Second, the Board has failed to proffer affidavit testimony from persons in the hearing room to rebut those findings, although such supplementation likely would have been permissible. *See generally School Board of Collier County, Fla. v. K.C.*, 285 F.3d 977, 981 (11th Cir. 2002) (discussing supplemental evidence standard). Third, the Court is aware of no legal principle that would forbid a hearing officer from making findings of fact based on nonverbal conduct that he personally observes during an administrative hearing, regardless of whether the court reporter formally records same in the official transcript. Neither the parties' filings nor the Court's research discloses any analogue in IDEA cases to the "sit and squirm" prohibition in the Social Security context. *See, e.g., McRoberts v. Bowen*, 841 F.2d 1077, 1081 (11th Cir. 1988). Fourth, in light of the lengthy laundry list of Benton's inappropriate behaviors identified by the Hearing Officer, there is no reason to believe that the exclusion of these few items would have made any meaningful difference in the end result.

[20]     The *Schaffer* decision was handed down on November 14, 2005, three weeks after the close of briefing in this matter. The Board immediately filed a Motion to Supplement (doc. 33) to incorporate *Schaffer* into its legal arguments. Benton opposed the Motion to Supplement, not on the ground that supplementation would be unfair or improper, but rather on the theory that *Schaffer* does not apply. That *Schaffer* may be distinguishable is not a valid reason to forbid the Board from citing to it. Therefore, that Motion is **granted**, and *Schaffer* will be considered in

-16-

*River County School Bd.*, 249 F.3d 1289, 1292 (11ᵗʰ Cir. 2001) ("because it is the parents who are seeking to attack a program they once deemed appropriate, the burden rests on the parents in this IEP challenge").

Two potential flaws to the Board's objection are evident. First, the Court must consider whether the *Schaffer* default rule is applicable to the specific circumstances presented in this case. Second, if so, the Court must ask the more fundamental questions of whether the Hearing Officer actually did fasten that burden of proof to the Board and whether any erroneous allocation of that burden made a difference in the final analysis.

Benton protests that *Schaffer* is confined on its face to a default rule in circumstances where no state rule purports to shift the burden to the school district. According to Benton, Alabama has just such a burden-shifting regulation; therefore, he contends, *Schaffer* is inapposite. Indeed, the *Schaffer* majority recognized that several states (including Alabama) have laws or regulations affixing the burden in IEP challenges directly on the school district. *Schaffer* stopped short of deciding whether its default rule must give way in the presence of a state provision to the contrary, reasoning that "[b]ecause no such law or regulation exists in Maryland, we need not decide this issue today." 126 S.Ct. at 537. The Board does not posit that the *Schaffer* rule would override any Alabama law or regulation to the contrary; therefore, the Court will not *sua sponte* raise that argument. Instead, the Board's stance on this point is confined to an assertion that Alabama law is in harmony with *Schaffer* because it places the burden of proof on the party making the hearing request. (Reply Brief, at 4.) Amazingly, the Board relies on the same Alabama regulation that Benton cites for a diametrically opposite proposition.[21] In that regard, the Board contends that Alabama Administrative Code § 290-8-9-

---

this Court's review of the Administrative Decision. That said, however, the undersigned recognizes and will consider Benton's position that *Schaffer* is irrelevant to the burden of proof issue as postured here.

[21]     Benton quotes Alabama Administrative Code § 290-8-9-.08(8)(c)(6)(i)(1) as obligating a school district to "assume the burden of proof regarding the appropriateness of services proposed or provided." (Opposition Brief, at 8.) But the Board quotes § 290-8-9-.08(8)(c) as reading that the burden "to prove their allegations" rests on the "party filing the hearing request." (Reply Brief, at 4.) Surely, only one of these mutually inconsistent passages can be correct.

-17-

.08(8)(c) imposes the burden of proof on the party filing the hearing request, but Benton argues that the regulation places the burden on the Board.  Neither side offers assistance in solving this paradox by explaining what exactly is going on with § 290-8-9-.08(8)(c).  However, the Court's research reveals two illuminating facts.  First, prior to July 1, 2005, the language relied upon by Benton was found in § 290-8-9-.08(8)(c), and that quoted by the Board was not.  Second, effective July 1, 2005, the Alabama Department of Education amended the regulation, eliminating the burden of proof language on which Benton relies and adopting that quoted by the Board.[22]

In addition to failing to explain their divergent citations to the same regulatory provision, the parties neglect to address the temporal significance of these two iterations of the regulation.  To the extent that the Board asks this Court to ascribe error to the Hearing Officer's failure to adhere to an amended regulation that did not take effect until nearly eight months after the Administrative Decision was issued, that argument must fail.  The Hearing Officer cannot be faulted for adhering to the burden of proof scheme set forth in the Alabama regulations at the time of the due process hearing, and for failing to predict and preemptively apply the amendment altering that framework more than half a year ahead of time.  The Board proffers no argument or authority whatsoever to support the proposition that the Hearing Officer's November 2004 ruling must be reviewed through the prism of the post-July 1, 2005 version of the regulation.  Nor does the Board suggest that such a regulation was intended to have retroactive effect, or that it is legally applicable to cases on judicial review as of its effective date.  Once again, the Court declines to consider arguments that the Board has not articulated.

Thus, this action falls outside the ambit of *Schaffer* and *Devine* because at the time of the Administrative Decision, Alabama had a regulation that specifically imposed the burden of proof on school districts when parents called into question the propriety of an IEP.  The Board has failed to offer any argument for the proposition that the *Devine / Schaffer* default rule takes

---

[22]    To date, these developments have not reached the computerized legal research services frequented by the Court; however, their veracity is confirmed at the Alabama Department of Education's official webpage, www.alsde.edu.

precedence over the then-conflicting Alabama regulation;[23] therefore, the Court will not *sua sponte* meander into such a thorny thicket to make the Board's arguments for it.  The burden of proof properly rested on the Board, and it was not error of the Hearing Officer to conduct the hearing in that manner.[24]  The Board's assignment of error on this point is **overruled**.

### C.   *Behavior Intervention Plan Issue.*

Third, the Board challenges the Hearing Officer's finding that Benton's right to a FAPE was infringed by the school system's failure to undertake appropriate behavior management techniques.  The Board's argument on this point is twofold.  First, it asserts that the record

---

[23]     At most, the Board merely points out that federal statutes such as the Rehabilitation Act, the Americans with Disabilities Act and Title VII allocate the burden of persuasion to the plaintiff.  (Reply Brief, at 4-5.)  But, as Justice Stevens ably noted in his concurrence in *Schaffer*, "[i]t is common ground that no single principle or rule solves all cases by setting forth a general test for ascertaining the incidence of proof burdens when both a statute and its legislative history are silent on the question."  *Schaffer*, 126 S.Ct. at 537 (Stevens, J., concurring).  There could be circumstances when "the purpose of a statute is best effectuated by placing the burden of persuasion on the defendant."  *Id.*  That other federal statutes may have been construed as allocating the burden of proof to a plaintiff is not, in and of itself, a basis for declaring that IDEA must assign burdens in like fashion.

[24]     Even if the Board were correct that the burden of proof should have resided with Benton, there has been no showing that the Administrative Decision hinged on the allocation of that burden of proof.  Nowhere did the Administrative Decision specify that the burden rested with the Board, nor did it state that the ruling in Benton's favor was a product of the Board's failure to satisfy any such burden.  Simply put, there is no reason to believe that shifting the burden of proof from the Board to Benton would have made any difference in the Hearing Officer's conclusions regarding behavioral plans.  The Board's argument to the contrary proceeds from a faulty premise that "the Appellee never attempted to support his allegation" that a behavioral plan was necessary and "fail[ed] to present any evidence on the behavioral issue." (Board Memorandum, at 23.)  In point of fact, Benton presented ample evidence, including the testimony of Benton's mother and the demonstrative evidence of Benton's conduct in the hearing room, in support of his position that a behavioral intervention was necessary.  For example, Benton's mother testified that Benton "scratches his self, bites his self," "hits real hard," and kicks people.  (Hearing Transcript, at 39-40.)  Benton himself engaged in an array of behaviors (clapping, pacing, repeatedly striking himself in the chest area, rubbing the Hearing Officer's head, hugging and grabbing strangers in the room, etc.) that might tend to support Benton's position that a functional behavior assessment and behavior intervention plan were warranted. Other evidence, discussed *infra*, supported a finding that Benton's inappropriate behaviors carried over to the classroom setting.  Thus, it is simply not accurate for the Board to maintain that there was no evidence to support Benton's position on the behavioral issue.

contains no evidence that Benton's behavior at school interfered with his education, or that such behavioral problems manifested themselves anywhere other than in his home environment purportedly "exacerbated by a turbulent family relationship."  (Board Memorandum, at 21.)  Second, it maintains that the Hearing Officer "wrongly substituted his own personal observation and judgment for that of the IEP Team and a highly qualified autism and special education expert."  (*Id.* at 22.)  Careful examination of the record reveals no error on either front.

The Board struggles mightily to distinguish Benton's clearly inappropriate behavior in the hearing room from his conduct in an educational environment.  (Board Memorandum, at 21-22; Suggested Determinations, at 4, 9-10; Reply Brief, at 6-7.)  In so arguing, the Board correctly notes that the IDEA is focused on provision of a FAPE to disabled children, and is not designed to ameliorate inappropriate behaviors beyond the school environment.  *See Devine*, 249 F.3d at 1293 (explaining that IDEA requires only "measurable and adequate gains in the classroom," not in the home); *JSK*, 941 F.2d at 1573 (similar).[25]  But the Board overlooks substantial record evidence that the types of behaviors exhibited by Benton in the hearing room (*e.g.*, striking his chest, clapping his hands, pacing, touching strangers inappropriately) were not anomalous, but are symptomatic of his behavior in other settings, including the classroom.  For example, a "Classroom Consultation" report prepared by Glenwood Inc. and dated August 27, 2002 references "challenging behaviors" by Benton in the school environment, states that "Jared *[sic]* will need to develop control of his behavior," and stresses the "importan[ce] that Jarred

---

[25]     A case cited by the Board adds a thoughtful, well-crafted caveat to this general proposition, by recognizing that "as a practical matter ... clear lines can rarely be drawn between the student's educational needs and his social problems at home.  Thus, typically an IEP in cases where student's disability is this serious ... must address such problems in some fashion." *Gonzalez v. Puerto Rico Dep't of Educ.*, 254 F.3d 350, 353 (1st Cir. 2001).  The *Gonzalez* court affirmed the district court's finding that the IEP must address the significance of the child's behavioral problems at home by including "further services and training for Gabriel's parents designed to help them manage Gabriel's behavior at home."  *Id.*  Thus, far from erecting an absolute barrier separating inappropriate home behaviors from school behaviors, *Gonzalez* recognizes the symbiotic, interrelated connection between the two, and the obvious possibility that inappropriate behaviors at home may carry over into the educational context and interfere with a child's right to a FAPE unless managed via an IEP.

learns to control his emotions and behavior." (Bd. Exh. 31.)[26] When Dr. Simpson spent three hours observing Benton in a classroom on May 10, 2004, he saw Benton "doing that flapping thing on his stomach" (*e.g.*, repeatedly striking himself in the stomach or thoracic region), which Dr. Simpson otherwise described as "ritualistic" "chest thumping, stomach thumping," just as Benton had done in the hearing room. (Hrg. Transcript, at 219, 369.)[27] Although his notes specify that he "observed no aggressive behavior by Jarred" during the observation period, Dr. Simpson also reported that Benton's teacher informed him "that Jarred is typically not aggressive at school" (*id.* at 226), with the modifier suggesting that there are occasions when he is aggressive at school.[28] Dr. Simpson also allowed that "with the syndrome of Autism, we assume we're going to see autistic behaviors" (*id.* at 238), and never stated that such an assumption was not borne out in Benton's case. Benton's mother, Ms. White, testified that on the brief occasions when she has gone to his classroom, she has observed her son engaging in self-stimulatory behaviors such as pacing around the room. (*Id.* at 35.) Benton's teacher for the 2002-03 and 2003-04 school years, Terrance Dunaway, testified that Benton did engage in behaviors associated with autism, and acknowledged his self-striking, chest-beating repetitive conduct. (*Id.* at 642-45.) Ms. Dunaway intimated, however, the school system's apparent philosophy that those autistic behaviors should simply be accepted rather than confronted with a behavioral intervention. (*Id.* at 645-46.)

The Board would have the Court ignore this evidence of Benton's inappropriate behaviors. As an initial matter, the Board argues that the contents of the IEPs are dispositive as to Benton's behavior in the classroom. (Board Memorandum, at 21; Reply Brief, at 5-6.) The

---

[26]    Although the specifics of Benton's challenging behaviors at school are not outlined in the Glenwood report, that document raises a strong inference of aggressive behaviors by advising, for example, that Benton should be told "'hands down' rather than 'don't hit.'" (*Id.*) Thus, the Glenwood report is persuasive evidence that Benton was engaged in inappropriate and aggressive behaviors in the school setting during the relevant time period.

[27]    Dr. Simpson testified that he could not recall whether he witnessed Benton engaged in other ritualistic behaviors during that observation period because his notes were silent in that regard. (*Id.* at 219.)

[28]    Dr. Simpson confirmed as much when he testified to his understanding that there had been incidents of aggression by Benton at school, albeit infrequent ones. (*Id.* at 370.)

2003-04 IEP, which Ms. White signed, reflects that "[t]his student exhibits no chronic behaviors that impede his/her learning or the learning of others." (Bd. Exh. 10.) The 2002-03 IEP includes a similar determination. Furthermore, both IEPs state that "a behavior plan is not needed." (Bd. Exh. 9, 10.) Because the IEP team, including Benton's mother, agreed that no behavioral intervention was needed, the Board maintains, the Hearing Officer could not properly have concluded otherwise. (Suggested Determinations, at 4-5.) A more searching examination of the hearing record reveals the flaws in such a position. At the hearing, Ms. White testified that she signed both IEPs and that she understood them. (Hrg. Transcript, at 75-7, 79.) But Benton's mother further indicated that while she signed the 2003-04 IEP, she did not agree with it because "[w]e've discussed his behavior for the past couple of years. It's not a day-to-day behavior. I[t] doesn't happen every day." (*Id.* at 82.) In fact, she testified, "I may have signed it, but I didn't agree with that," referring to the conclusion that no behavioral plan was needed. (*Id.*) Ms. White explained that by signing the IEPs, she did not intend to signify her acquiescence to the IEPs. In her words, "I wasn't meaning to do anything. I just signed that I was there." (*Id.* at 125.)[29] Ms. White felt that behavioral intervention was necessary because Benton's behaviors were "getting worse" when he became "really, really frustrated" and "self inflicting" in his "aggression." (*Id.* at 118-19.) Benton's mother indicated that she had reported his home behavior issues to school officials, but that no one from the school had directed her to any resources for assistance. (*Id.* at 82-83.) She said that notwithstanding her signature on the IEPs, she wanted those IEPs to include behavior intervention plans. (*Id.* at 111-12.)[30] Her position

---

[29] The face of the IEPs makes clear that Ms. White's signature has no deeper significance than to confirm that she "attended and participated in the meeting to develop this IEP." (Bd. Exh. 9, 10.) Her signature does not purport to announce her concurrence with the terms of the IEP, or her lack of objections to same.

[30] In light of Ms. White's testimony in this regard and based upon a close reading of her testimony in its entirety, the Board's characterizations that she "agreed that his behaviors did not impede his education" (Reply Brief, at 9) and that she "supported the IEP team's decision not to specify a behavioral plan" (Suggested Determinations, at 29) are unfair and misleading. The same applies to the Board's overstated claim that the Hearing Officer's ruling substituted his judgment for that of Benton's mother. (Board Memorandum, at 23.) It did no such thing, given the clear evidence that Ms. White had been troubled by the absence of behavioral aspects to the IEP for years. By all accounts, Ms. White's unhappiness over the lack of a behavioral plan was

that she was dissatisfied with the IEPs on behavioral issues was bolstered by the testimony of Benton's teacher, Ms. Dunaway, that Ms. White had contacted her in October 2002 inquiring about behavior management and its omission from Benton's IEP.  (*Id.* at 687-90.)  Clearly, notwithstanding the text of the IEPs and her signature on same, Benton's mother had ongoing concerns about the lack of a behavioral component to the IEPs.  It was not error for the Hearing Officer to determine that self-serving IEP findings that no behavioral intervention was necessary were not reflective of Benton's mother's wishes and were outweighed by other record evidence to the contrary, as outlined above.[31]

As an alternative argument, the Board maintained throughout the hearing process and in the IEPs that because Benton's classroom behaviors are a natural outgrowth or byproduct of his autism, no behavioral plan was needed.  For example, the IEPs developed for Benton in 2002-03 and 2003-04 state in conclusory terms that "Jared's *[sic]* behaviors are directly related to Autism and therefore a behavior plan is not needed."  (Bd. Exh. 9, 10.)  It is not clear whether the Board would advance a similar contention in these proceedings.

To the extent that the Board does adopt that tack, the undersigned concurs with the Hearing Officer that "[t]he fact that the behaviors demonstrated by the child are a manifestation of Petitioner's autism does not excuse a school system from providing behavior management techniques either in the child's IEP or in a separately formulated behavior intervention plan."  (Administrative Decision, at 21.)  Despite some equivocation, the Board's own expert, Dr. Robert Simpson, testified that a child's autistic status does not *per se* render a functional behavior assessment and behavior intervention plan inappropriate, and sometimes there is a purpose to conducting behavior analysis for autistic children.  (Hrg. Transcript, at 142, 405,

_____

one of the forces (if not the principal force) animating this litigation.  The Board's suggestion otherwise is groundless.

[31]     Reinforcing this conclusion, the Hearing Officer's findings regarding the necessity of behavior assessment and intervention for Benton merit deference because they specifically implicate his educational expertise and relate directly to his own personal observations of Benton and his credibility findings with respect to Ms. White and the Board's witnesses, including Dr. Simpson and Ms. Dunaway.

426.)[32]  While autism has no known cure, Dr. Simpson explained, it is generally possible to shape, improve and mitigate its behavioral side effects through the educational process.  (*Id.* at 447-48.)  Thus, the touchstone of the analysis as to whether a behavior plan is necessary is not the type of disability the child has; rather, the propriety of those instruments turns on "whether or not there are significantly inappropriate behaviors for which we do not understand their cause." (*Id.* at 405.)  "[G]ood professional practice dictates that you determine interventions based on the unique needs of each child," rather than categorically stating (as the IEPs did) that no behavioral intervention is needed because the behaviors in question arise from autism.  (*Id.* at 199.)  *See generally Loren F. ex rel. Fisher v. Atlanta Independent School System,* 349 F.3d 1309, 1312 n.1 (11th Cir. 2003) (explaining that IEP must provide "an education that is specifically designed to meet the child's unique needs").  Likewise, Ms. Dunaway acknowledged that any IEP for Benton should be designed specifically for him.  (*Id.* at 632-33.)  Thus, extensive evidence at the due process hearing refutes the school system's convoluted and demonstratively flawed rationale that no behavior plan was warranted because the behaviors at issue related to Benton's disability.

Finally, the Board asks the Court to overturn the portion of the Administrative Decision concerning behavioral intervention because the Hearing Officer purportedly "substituted his own personal observation and judgment for that of the IEP Team and a highly qualified autism and special education expert."  (Board Memorandum, at 22.)[33]  Without question, "[l]ocal educators

---

[32]     In that regard, Dr. Simpson expressed discomfort with the stated rationale in the IEPs for not providing Benton with a behavior plan, explaining that the documents would have been better "if there had been some comment in there that says, since he has not demonstrated significantly aggressive or harmful behaviors to self, others, or the environment, and since his behaviors are those that are typical of children with Autism, a behavior plan is not needed.  That would have made it much better."  (*Id.* at 457.)

[33]     Remarkably, the Board also takes the position that "the evidence was contrary to the hearing officer's finding that the child had inappropriate behavior in the hearing room." (Suggested Determinations, at 29.)  Such an argument is both unreasonable and untenable, and is apparently based on (a) a misguided view that any nonverbal conduct during the hearing that the court reporter did not note in the official transcript cannot be considered, and (b) a hopelessly strained interpretation of Dr. Simpson's testimony that, while he did observe certain inappropriate behaviors by Benton in the hearing room, there were other behaviors that the expert "didn't really notice" because he was not "paying attention" to them.  (Hrg. Transcript, at 423-24.)  The evidence unequivocally supports the Hearing Officer's findings that Benton

deserve latitude in determining the individualized education program most appropriate for a disabled child," and neither this Court nor any other is or should be in the business of making educational policy. *Hartmann*, 118 F.3d at 1001. But the term "substituting judgment" is a loaded, pliable phrase that is too easily manipulated to fit any desired outcome. To accept the Board's argument at face value would be to find that hearing officers wrongly substitute their judgment for that of school system educators whenever they deem an educator-designed IEP improper or inadequate in some way. That is not the law. *See, e.g., County School Bd. of Henrico County, Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 307 (4th Cir. 2005) ("the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate").

Likewise, the Board's argument would seem to compel a conclusion that a hearing officer wrongly substitutes his judgment for that of a school system's expert witness whenever he reaches conclusions contrary to those of the expert. Whatever the term "substituting judgment" means (and the Court does not know because it is not developed to any meaningful degree in the case law cited by the Board), it plainly does not prohibit the Hearing Officer from finding that the Board's expert testimony should not be credited.[34] The Court is of the opinion

---

engaged in inappropriate behaviors in the hearing room. For the Board to assert otherwise is folly.

[34] The authorities that the Board string-cites on page 24 of the Suggested Determinations in support of the "substituting judgment" argument direct cautionary language at courts, not at hearing officers. *See Fort Zumwalt School Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997) ("courts are not to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Hartmann*, 118 F.3d at 1000-01 ("Administrative findings in an IDEA case are entitled to be considered *prima facie* correct, and the district court, if it is not going to follow them, is required to explain why it does not."); *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2nd Cir. 1997) ("A court may not second-guess state educators' policy decisions in the effort to maximize a handicapped child's educational potential."); *Union*, 15 F.3d at 1524 ("We also accord deference to the policy decisions of a school district when it is acting within the bounds of federal and state law."); *Todd D. by Robert D. v. Andrews*, 933 F.2d 1576, 1581 (11th Cir. 1991) ("the district court must pay great deference to the educators who develop the IEP"). None of these decisions compel a hearing officer to treat an educator-drafted IEP with kid gloves. Far from supporting the Board's position, these authorities, read collectively, spell out a compelling admonition to this Court not to overturn blithely the Hearing Officer's decision, which is precisely what the Board requests. The Board in one breath accuses

-25-

that the Hearing Officer's finding that the Board violated Benton's right to a FAPE by failing to furnish him with a behavioral assessment and behavioral intervention plan is entitled to deference, is supported by the greater weight of the evidence in the administrative record, does not violate any "agreement" by Ms. White, and does not constitute improper second-guessing of the decisions made by school officials in the relevant IEPs. The Hearing Officer was not obliged to accept Dr. Simpson's expert opinion that no behavioral intervention was warranted, when considerable other evidence (as described *supra*) counseled otherwise. Likewise, any deference due the Board's decision not to include a behavioral component to Benton's IEPs is substantially outweighed by the plainly faulty reasoning (*e.g.*, that no behavioral component was necessary simply because Benton's behaviors were the product of his autism) articulated in the relevant IEPs to support that decision.[35]

For all of these reasons, the Board's assignment of error to the Hearing Officer's conclusion that Benton's IDEA rights were violated by the Board's failure to furnish him with a behavioral assessment and behavioral intervention plan is **overruled**.[36]

_____

the Hearing Officer of substituting judgment, then in the next urges this Court to substitute its judgment for the Hearing Officer on matters lying within that Hearing Officer's core competencies. *See, e.g., R.D.*, 374 F. Supp.2d at 89 (noting that a district court may not substitute its own views for those of the hearing officer in the IDEA context). For these reasons, the "substituting judgment" line of argument is not particularly illuminating or helpful here.

[35] This last point is significant. The school system drafted the IEPs in such a manner that they implicitly acknowledge the existence of inappropriate behaviors by Benton, then declare such behaviors unworthy of intervention because of their link to his disability. Such reasoning is both factually and legally unsatisfying, and lends support to the Administrative Decision.

[36] To say that the Hearing Officer did not err on this point is not necessarily to endorse his reasoning. This aspect of the Administrative Decision rests almost exclusively on the Hearing Officer's observations of Benton in the hearing room. (Administrative Decision, at 20-21.) In the undersigned's view, this rationale is too narrow. At a minimum, the Hearing Officer should have explained why those hearing-room behaviors were germane to Benton's FAPE. This connection may properly be supported in at least the following two respects: (1) the substantial record evidence that Benton was engaging in inappropriate behaviors in the school environment, as well, and (2) the practical link between Benton's in-school behavior and his at-home behavior, such that the two were interrelated and failings in one could reasonably expect to yield deterioration in the other. The record absolutely supported (1), even if no testimony

-26-

**D.      *Records/Reports Pertaining to Achievement of Annual Goals.***

1.      *Status of Fourth and Fifth Grounds for Relief.*

The Board's remaining two grounds for relief from the Administrative Decision, as identified in its Motion to Dismiss, are unrelated to the behavioral assessment/intervention issue. Instead, they arise from an array of technical defects that the Hearing Officer found in Benton's IEPs, relating to mastery dates of benchmarks and adequacy of annual goals. The Board's fourth stated ground asserts that the Hearing Officer improperly concluded that these defects were so severe as to render the IEPs unable to confer an educational benefit on Benton. (Motion, ¶ 4.) Its fifth stated ground posits that "any technical violations in a student's educational plan do not deprive the student of a FAPE so long as the Appellant has provided the disabled student with a basic floor of opportunity that affords some educational benefit." (*Id.*, ¶ 5.)[37] There are several glaring problems with this proposed formulation of the issues. As an initial matter, it is unclear how (if at all) the fourth and fifth grounds are analytically distinct, as each appears to articulate the same concepts, albeit in slightly different terms. Moreover, the fifth ground was not identified in those terms in the Board's Statement of Issues on Appeal; thus, to the extent that it does constitute an independent basis for relief, this issue has not been joined in a timely and proper manner in compliance with the Orders of this Court.[38] The Board offers neither excuse nor explanation for the omission of this ground from the Statement of Issues. Finally, the Board's Memorandum and Reply Brief neglect to brief the fifth ground at all, or at least to brief it in a form that is distinguishable from the fourth ground. The Court will not speculate what the

---

regarding (2) was elicited during the hearing.

[37]      The fifth ground also complains that the Hearing Officer "based his decision on allegations never made." (Motion, ¶ 5.) This contention is plainly redundant of the Board's first stated ground for relief relating to violations predicated on uncharged conduct. Having already tilled this soil once, *supra*, the undersigned declines to re-plow it at this juncture.

[38]      On August 8, 2005, Magistrate Judge Bivins entered a Rule 16(b) Scheduling Order (doc. 23) directing the Board to file, on or before August 22, 2005, "a statement of issues, which shall set forth in detail, the issues to be resolved." (Scheduling Order, ¶ 1.) Because the Motion's fifth ground was not identified in the Board's Statement of Issues and because the Board has offered no justification for that omission, it cannot properly be injected into the litigation for the first time in the context of a dispositive motion.

Board might have intended to argue with the fifth ground presented in the Motion to Dismiss, where the Board has failed to provide any elaboration of the cursory verbiage presented in the Motion itself.

In light of these considerations, the fifth ground for relief identified in the Motion to Dismiss is **overruled** as redundant of the fourth ground, not properly preserved in this action as a distinct objection to the Administrative Decision, and unsupported by the Board's memoranda of law.  To the extent that the fifth ground merely reiterates or rephrases the fourth ground for relief, its merits will be considered below.

>        2.        *Whether the Procedural Violations of IDEA Constitute Denial of FAPE.*

The Administrative Decision identifies several non-behavioral aspects of the 2002-03 and 2003-04 IEPs that are contrary to the IDEA.  These defects include lack of notations as to whether Benton had mastered any of his benchmarks, vagueness as to Benton's present level of performance, and lack of measurable annual goals.  According to the Hearing Officer, the mastery dates shortcoming was "[t]he most glaring deficiency" in the IEPs, and was significant because the absence of dates of mastery prevented parents or other IEP team members from ascertaining Benton's progress during the school year.  (Administrative Decision, at 23.)  Meanwhile, the present performance level was deemed important because it was the barometer by which his progress in annual goals (for example, the Hearing Officer construed one goal as calling for Benton to demonstrate "eighty percent accuracy of his present level of performance") would be measured.  (*Id.*)  Without a clear exposition of Benton's present level of performance, these annual goals defined by reference to present performance levels are unmoored, untethered and meaningless.  And the Hearing Officer deemed the "annual goals" section of the IEP flawed because it did not identify measurable goals, but cryptically referred to an 80% accuracy objective, without delineating "what the Petitioner was to attain eighty percent accuracy in." (*Id.*)

The hearing testimony of Dr. Simpson reinforced the Administrative Decision that these aspects of the IEPs were wanting.  Dr. Simpson acknowledged that the purpose of an IEP is to provide a written record of the child's present level of performance, measurable annual goals, strategies to achieve such goals, intermediate benchmarks to be achieved along the way, and whether satisfactory progress in meeting such goals was actually achieved.  (*Id.* at 201-02.)

Notwithstanding these objectives, Dr. Simpson agreed that Benton's IEPs for 2002-03 and 2003-04 lacked any record of dates of mastery. (*Id.* at 252-54, 256, 318, 414-15.)[39] Dates of mastery, Dr. Simpson concurred, are important to trace a child's progress over the years, and should be recorded on IEPs. (*Id.* at 202-03.) Furthermore, certain of the 80% accuracy annual goals on Benton's IEPs he criticized as vague and "not as good as I would like [them] to be in terms of specifying the performance." (*Id.* at 190.)[40] More generally, he admitted that he "would say no" if asked whether Benton's IEPs were technically precise. (*Id.* at 380.) Despite these flaws, Dr. Simpson testified that to his knowledge Benton's education had not suffered because of any

---

[39] As noted *supra*, the Board proffered different copies of the IEPs at the due process hearing that actually did include mastery dates. These IEPs were materially different from the iterations furnished to Benton's counsel in advance of the hearing. This issue was litigated extensively during the due process hearing, and the Board put on testimony that the discrepancy was the result of an oversight in compiling Benton's records for his counsel, rather than the product of any nefarious intent. The Hearing Officer disagreed, finding "based on the totality of the evidence that the dates of mastery were not included on those IEPs until <u>after</u> the Petitioner's attorney examined the records at the local education offices on June 4, 2004. ***In other words, the IEPs were altered.***" (Administrative Decision, at 27 (emphasis added).) The Hearing Officer excluded the modified IEPs from evidence because they were not provided to Benton's counsel at least five business days before the hearing, as required by the IDEA. (Administrative Decision, at 15 n.2; Hrg. Transcript, at 312-15, 471, 476-79.) Although the Board is clearly unhappy with the Hearing Officer's findings in that regard and devotes considerable space to its innocent explanation for what transpired, the Board has not appealed those evidentiary rulings; therefore, the Court need not and will not revisit them here. The Administrative Decision also notes that even if the altered IEPs were allowed, the dates of mastery are demonstrably deficient because the listed dates for each task were the same. All were pegged to the end of the school year, in contravention of the periodic, contemporaneous mastery dates contemplated by the IDEA and in frustration of any attempt to monitor chronological progression of benchmark mastery during the school year. (Administrative Decision, at 16, 27.) The Board has not challenged this finding, either.

[40] For example, a goal under which Benton was to demonstrate increased math readiness skills by performing with 80% accuracy when given tasks on instructional level was problematic, in Dr. Simpson's eyes, because of the vagueness in "instructional level" as it relates to present level of performance. (*Id.* at 190-91.) Furthermore, the term "increased math readiness skills" was unsatisfactory because it is not measurable, according to Dr. Simpson. (*Id.* at 192-93.) Dr. Simpson found similar flaws in terms of measurability and present performance level with an annual goal that the student will increase his use of words to communicate. (*Id.* at 196.) Those goals were listed in Benton's 2002-03 IEP. (Bd. Exh. 9.)

imperfections in the IEPs, such that those deficiencies have no practical significance.  (*Id.* at 380-81.)

Under the IDEA, an IEP must include "a statement of measurable annual goals, including benchmarks or short-term objectives," related to meeting the child's educational needs resulting from his disability.  20 U.S.C. § 1414(d)(1)(A)(ii).  The Board's expert agreed that the absence of dates of mastery and the vagueness and measurability problems in the annual goals rendered Benton's IEPs technically noncompliant.  However, he also testified that the issue of whether the IEPs were technically pristine was "dwarfed" in his view by the question of whether the school system was "making a good-faith effort to do everything they know to do to provide an appropriate education for the child."  (Hrg. Transcript, at 377.)  Dr. Simpson opined that the Board was putting forward such a good-faith effort, irrespective of any arcane glitches in the paperwork.  (*Id.*)  The Board adopts this stance in its Motion.  Rather than taking the unsustainable position that its IEPs were beyond reproach, the Board falls back on the principle that procedural defects, without educational consequences, are insufficient to violate a child's right to a FAPE.  Indeed, in analyzing whether a FAPE was provided in cases arising under the IDEA, courts must determine: "(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit."  *School Bd. of Collier County, Fla. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002).  "A procedurally defective IEP does not automatically entitle a party to relief."  *Id.*  Courts assess the impact of the procedural defect, rather than simply the existence of the defect itself.  *Id.*[41]  In a similar vein, the law is clear that

---

[41]       The Board insists that the appropriate legal standard is that if procedural violations of IDEA are found, the Court must examine "whether a preponderance of the record evidence shows that those procedural violations actually caused substantive harm to Jarred Benton in his education."  (Memorandum, at 3.)  Although the Board cites several authorities for this proposition, none of them invokes this "actually cause substantive harm" standard.  That said, certain courts have adopted such a test.  *See Knable ex rel. Knable v. Bexley City School Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) (IDEA relief is appropriate upon findings of procedural violations only where such violations have caused substantive harm to child or his parents); *see generally E.D. ex rel. Dukes v. Enterprise City Bd. of Educ.*, 273 F. Supp.2d 1252, 1260 (M.D. Ala. 2003) (in IDEA cases, procedural violations do not entitle plaintiff to relief unless they harmed the student).

technical perfection is not the objective of the statute.  After all, "[t]he state is not required ... to maximize the handicapped child's potential; rather, the state must provide the child a 'basic floor of opportunity,' consisting of access to specialized instruction and related services."  *Doe*, 915 F.2d at 665; *see also Devine*, 249 F.3d at 1292 ("a student is only entitled to some educational benefit; the benefit need not be maximized to be adequate"); *JSK*, 941 F.2d at 1572-73 ("when measuring whether a handicapped child has received educational benefits from an IEP and related instructions and services, courts must only determine whether the child has received the basic floor of opportunity").  The types of IEP procedural defects that have been held to violate a child's right to a FAPE are those that "result in the loss of educational opportunity," "seriously infringe upon the parents' opportunity to participate in the IEP formulation process," or "cause[] a deprivation of educational benefits."  *A.I. ex rel. Iapalucci v. District of Columbia*, --- F. Supp.2d ----, 2005 WL 3274479, *9 (D.D.C. Sept. 19, 2005).

Thus, the Board correctly posits that the IDEA does not mandate an IEP to be all that it can possibly be.  Instead, the FAPE requirement is satisfied so long as the IEP provides a "basic floor of opportunity."  Simply put, then, the Board's position is that whatever infirmities Benton's 2002-03 and 2003-04 IEPs might have had, they do not matter because there is no evidence that Benton's education was adversely affected.  But the Hearing Officer plainly found adverse impacts on Benton.  Where dates of mastery are either excluded from IEPs or jotted in as a *pro forma* afterthought at year's end, the IEP team "cannot determine the progress that the child has been making during the school year" towards achieving annual goals and whether adjustments to the program might be necessary.  (Administrative Decision, at 23.)  Likewise, the Hearing Officer opined that in the absence of meaningful, measurable goals and objectives, there can be no "appropriate and meaningful education and developmental interventions for a child with autistic spectrum disorder."  (*Id.* at 24.)  Because these observations and findings go directly to the Hearing Officer's special expertise in educational matters and because such determinations are clear, well-developed, well-reasoned and well-supported, the undersigned finds that they are entitled to deference.

In response, the Board would minimize and marginalize these acknowledged blemishes in the IEPs to the point where they are utterly inconsequential.  But a reasoned analysis reflects that these were no trivial, trifling technicalities; to the contrary, the defects in Benton's IEP went

-31-

to the suitability of the overall education program, the ability of his teachers and parents to evaluate his execution of that program in a meaningful way, and the ability of the school system and Benton's parents to track his performance. Without dates of mastery for Benton's IEP benchmarks, there is no permanent school record showing his achievements as to those benchmarks over time.[42] Needless to say, it would be extraordinarily difficult for meaningful programs to be fashioned prospectively for Benton without reasonable records to demonstrate where he had been and what he previously had and had not been able to achieve. From an educational standpoint, Benton's teachers, counselors and parents desperately needed the diagnostic, evaluative tool of dates of mastery to understand Benton's status and needs. The omission of such information must necessarily have a detrimental effect on educational programs formed and implemented for Benton on a going forward basis, inasmuch as such programs would be based on imperfect (and/or simply missing) data about Benton's achievement.[43] Similarly, without meaningful, measurable objectives and goals, Benton's educators and parents were engaged in a futile endeavor to pin the tail on a moving donkey while blindfolded in a dark room. In other words, meaningful, measurable objectives give Benton a target to work towards and his educators and parents a way to evaluate his progress. The mushy, ambiguous, unquantifiable goals often listed in Benton's IEPs are at odds with IDEA objectives to have

---

[42]    The Board objects that record evidence shows that progress reports were sent home to Benton's mother periodically. (*See* Board Exh. 87; Hrg. Transcript, at 536.) But these reports were mere single-digit numerical assessments of Benton's progress towards achieving annual goals, with no indication of whether he had successfully negotiated any of the benchmarks, or stepping stones, along the way. It is the failure to maintain records showing dates of mastery of benchmarks, not any defect in progress reporting of annual goals, to which the Hearing Officer's findings applied. Besides, not a single one of the four annual goals listed in the "Progress Report" was listed as having been achieved during the 2003-04 school year. (Board Exh. 87.) All of them included ratings of "[a]dequate progress being made toward goal," but did not show whether any interim steps had been satisfied. (*Id.*) A global statement that progress toward big-picture goals is being made is a poor pedagogical and evaluative substitute, indeed, for any indication as to whether and, if so, when definable, measurable stepping stones have been achieved.

[43]    *Cf. Iapalucci*, 2005 WL 3274479, at *10 (observing that omission of certain required information from IEPs does not violate right to FAPE if the missing information was nonetheless known to all parties at the time).

Benton progress towards tangible goals and measure his achievement in working towards them. Vague and unmeasurable objectives are the handmaiden of stagnation, as a program cannot possibly confer an educational benefit to Benton if his teachers and parents do not know where they are trying to take Benton and how they will know when he has arrived.[44]

As a final observation, the undersigned emphasizes that it is not substituting its judgment for that of Escambia County education officials as to what educational methodology or techniques might be most effective in conferring educational benefits upon Benton. This is not a case that turns on one's pedagogical persuasion or educational philosophy. The Court does not secondguess the methodology employed by the school system as the nuts and bolts of teaching Benton every day. What the Court does find unacceptable and in violation of Benton's right to a FAPE is the Board's inexplicable disregard for minimum practices in preparing and implementing IEPs for Benton. The Board does not keep meaningful records showing whether and when Benton satisfies benchmarks delineated in his IEPs. Such an oversight violates the requirements of the IDEA and breeds confusion and ignorance in the educational programs prepared for Benton, simply because there is no institutional knowledge or meaningful record as to what tangible stepping stones he has achieved from one year to the next. Likewise, the Board has couched Benton's annual goals in fuzzy, ambiguous, ill-defined terms that render it difficult to know what the objectives are, and virtually impossible to measure whether he has achieved them.[45] On this record, the Court finds that the procedural inadequacies in Benton's IEPs

---

[44]    The Board protests that there was no evidence that Benton was deprived of an educational benefit by this IEP. But such a contention is ultimately circular. The flaws in Benton's IEPs are such that it is not possible to track his educational progress against goals in a meaningful way, and no records delineating his attainment vis a vis incremental benchmarks towards achieving those goals have been maintained. Amidst this IEP-induced murkiness, it would be inordinately difficult to assess whether Benton is receiving an educational benefit for the simple reason that the defects in the IEP deprive a factfinder of the necessary tools to evaluate his progress. Having crafted the IEP in a manner that defies assessment of Benton's progress, the Board cannot be heard to complain of lack of evidence of insufficient progress.

[45]    These errors are not merely superficial. Inspection of Benton's IEPs for 2002-03 and 2003-04 reflects that annual goals and benchmarks stagnated and even backslid from year to year, with no indication as to whether he had made progress towards achieving them. For example, the 2002-03 IEP included a benchmark that Benton "will demonstrate cutting skills by

resulted in a loss of educational opportunities, deprived his parents of information reasonably needed to enable them to participate in the IEP formulation process, and caused a deprivation of educational benefits, thereby denying him a FAPE.  *See Iapalucci*, 2005 WL 3274479, at *9.

The Board's assertion that the Hearing Officer erred in finding that inadequacies in Benton's IEPs violated his right to a FAPE is **overruled**.

## IV.   Conclusion.

For all of the foregoing reasons, the undersigned finds that the Board's assignments of error to the Administrative Decision are lacking in merit.  Accordingly, the Motion for Summary Judgment or, in the Alternative, Judgment on the Administrative Record (doc. 29) is **denied**. The administrative record being sufficiently developed to enable the Court to evaluate the validity of the Hearing Officer's findings, the parties not having identified any material disputes of fact warranting an evidentiary hearing, and the Board's initial pleading not purporting to raise any issues or seek any relief other than the appeal of the Administrative Decision, no further proceedings are necessary or appropriate in this action.  Indeed, the foregoing determinations are dispositive of all material issues identified by the parties.  For that reason, notwithstanding the

---

cutting straight, diagonal, and curved lines without assistance on 8 of 10 trails [*sic*]."  (Bd. Exh. 9.)  The 2003-04 IEP included a benchmark very similar to its predecessor, except that the term "without assistance" had been replaced by the term "with assistance."  (Bd. Exh. 10.)  Was Benton able to achieve the "without assistance" benchmark in 2002-03?  If so, then why did the 2003-04 benchmark go backwards?  Elsewhere, there is substantial overlap between the 2002-03 benchmarks and those for 2003-04.  Is that because Benton was unable to achieve the 2002-03 benchmarks?  If he had actually achieved them, then what educational benefit would be conferred by requiring him to reestablish his ability to satisfy those same benchmarks the next year?  Thus, the missing data throws Benton's IEPs into disarray, undermining the goals and objectives set for him and reducing the IEP process to a hollow shell of what the IDEA intended. Such a state of affairs necessarily implicates Benton's educational opportunities and benefits, stripping him of a FAPE.  *Compare Amanda J. ex rel. Annette J. v. Clark County School Dist.*, 267 F.3d 877, 895 (9th Cir. 2001) (school district's failure to develop IEP in accordance with IDEA procedures may itself deny child a FAPE, thereby mooting question of whether proposed IEPs were reasonably calculated to confer educational benefits) *with Jack P. v. Auburn Union Elementary School Dist.*, 2005 WL 2042269, *18 (E.D. Cal. Aug. 23, 2005) ("Plaintiff rightly points out that a failure to keep good records could make it difficult to tell whether Jack lost an educational opportunity, however, in this case the records are sufficient to provide a decent picture of Jack's performance. It is clear that some of the goals were met, and it is also clear that Jack made little to no progress on others.").

-34-

absence of a parallel dispositive motion filed by Benton's counsel, the Administrative Decision is hereby **affirmed** and the instant appeal is **dismissed**.[46]  The Board's Motion to Supplement (doc. 33) is **granted**.

DONE and ORDERED this 23rd day of December, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[46]    In upholding the Administrative Decision, the undersigned does not find (and the Hearing Officer did not find) any violation of the IDEA based on the Board's failure to prepare a separate IEP for Benton for 2004-05.  The record establishes that the Board's reasonable efforts to develop such an IEP were stymied by Benton's parents' unwillingness to participate, leaving Benton without the benefit of a new IEP.  (Hrg. Transcript, at 577-88, 672-74.)  Where delay in formulating an IEP is caused by a student (or his parents), the procedural requirements of the IDEA are not violated.  *See Loren,* 349 F.3d at 1312 (parents' remedies under IDEA may be limited even in absence of FAPE if parents' actions frustrated school's efforts to provide same); *Doe*, 915 F.2d at 663 (no procedural violation where delay in formulating IEP was caused by child's parents); *E.D. ex rel. Dukes v. Enterprise City Bd. of Educ.*, 273 F. Supp.2d 1252, 1267-68 (M.D. Ala. 2003) (where delay in implementation of new IEP was at least partially attributable to child's parents, such delay is not a violation of procedural requirements of IDEA).  Thus, nothing in the Administrative Decision, and nothing in this Order, imputes wrongdoing to the Board for the non-completion of an IEP for Benton for the 2004-05 school year.